### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF GEORGIA
### GAINESVILLE DIVISION

| | |
|---|---|
| **WILLIAM R. DEAL,** | |
| **Plaintiff,** | **CIVIL ACTION FILE NO.** |
| **v.** | **2:17-CV-00209-RWS** |
| **TUGALO GAS COMPANY, INC., THOMAS GILMER, SARAH GILMER PAYNE, ETHELDRA GILMER, BRUCE STANCIL, JR. RAY CRENSHAW, and LEWIS SMITH** | |
| **Defendants.** | |

### FIRST AMENDED VERIFIED  COMPLAINT

COMES NOW Plaintiff WILLIAM R. DEAL and, pursuant to Rule 15(a)(1)(B), amends and restates his Complaint against Defendants Tugalo Gas Company, Inc., Thomas Gilmer, Sarah Gilmer Payne, Etheldra Gilmer, Bruce Stancil, Jr., Ray Crenshaw, and Lewis Smith ("Defendants") as follows:

### NATURE OF THE ACTION AND PARTIES

1.

a)     Plaintiff was a shareholder of Defendant Tugalo Gas Company, Inc. ("Tugalo" or the "Company"), or otherwise held a beneficial ownership interest in the Company during all times material to this action.

b)     Plaintiff brings this action based upon Plaintiff's right as a minority shareholder to assert a direct action against Defendants to recover damages attributable to Defendants' collective tortious conduct that constitutes a breach of Defendants' fiduciary duties to Plaintiff as former or present Directors of Tugalo. Defendants have also conspired and acted collectively to "freeze out" Plaintiff from any participation whatsoever in the Company, and otherwise oppress and prevent Plaintiff from benefiting from his ownership interest therein.  Such actions serve to impair the value and marketability of Plaintiff's shares and to damage Plaintiff in a way that is unique and different from any damages incurred by other shareholders, because Defendants have continued to receive payments and benefits from Tugalo in lieu of distributions or an increase in the value of other shareholders' shares, while Plaintiff has not received any such payments or benefits.

c)     Additionally, or alternatively, Plaintiff brings this action derivatively, on behalf of Tugalo, to recover corporate assets that have been diverted from the Company, as well as to recover improper dividends that have been distributed unevenly and improperly by the Company, at the direction of Defendant Thomas Gilmer, in conspiracy with the other Defendants or with the approval of the other Defendants, as evidenced by the other Defendants' failure to disclose the improper dissipation of corporate assets to Plaintiff, and by the Defendants' tacit, implied, or

express approval of such dissipation.  Thomas Gilmer, individually and through a voting trust, and otherwise with the cooperation of Defendants Sarah Gilmer Payne, Etheldra Gilmer, Bruce Stancil, Jr., Ray Crenshaw, and Lewis Smith, controls a majority voting interest in Tugalo, through which he has orchestrated a pattern of payments and other distributions for the benefit of himself and the other Defendants, most of whom are "favored shareholders."

d)     This action is not a collusive one to confer jurisdiction that this Court would otherwise lack.

e)     Plaintiff is the son of the late Mrs. Elizabeth G. Deal, and on September 13, 2016, through transfer by assignment from the Elizabeth G. Deal Revocable Trust, Plaintiff became a shareholder in the Company.

f)     Prior to that time, Plaintiff was a member of EGD Holdings, LLC ("EGD Holdings").

g)     Accordingly, at all times relevant hereto, Plaintiff was either a member of EGD Holdings, a Trustee and beneficiary of the Elizabeth G. Deal Revocable Trust, or a shareholder in the Company himself.

h)     Plaintiff fairly and adequately represents the interests of the Company in enforcing the rights of the Company.

i)     On March 27, 2017, Plaintiff served the board of directors of the Company with written demand as required by O.C.G.A. § 14-2-742.  A true and

correct copy of the March 27, 2017 demand is attached hereto as Exhibit "A". Previously, on October 12, 2012, a similar demand was served on the Company by EGD Holdings and on behalf of Plaintiff as a member of EGD Holdings. A true and correct copy of the October 12, 2012 demand is attached hereto as Exhibit "B". The October 12, 2012 demand by EGD Holdings was rejected by the Company. Although the Company represented it was "investigating" Plaintiff's claims set forth in his March 27, 2017 demand, no formal rejection of that demand was ever received by Plaintiff.

j)    Plaintiff also brings this action to obtain a declaratory judgment that specific transactions previously engaged in by Thomas Gilmer or the Company, whereby shares were purchased by Thomas Gilmer or the Company in violation of Company Bylaws providing for rights of refusal in favor of all shareholders, were invalid and void *ab initio*.

k)    Plaintiff seeks preliminary and permanent injunctive relief to enjoin Defendants from engaging in transactions and related expenditures inconsistent with the Company's ordinary course of business or that constitute *de facto* dividend distributions to favored shareholders. Plaintiff shows that such expenditures and corresponding tax deductions improperly taken by the Company may violate federal tax laws, detrimentally impact the Company's profitability and value, and reduce the marketability of Company shares.

l)     Plaintiff further seeks appointment of an auditor to examine the books and records of the Company, and conduct an accounting and/or audit of prior unauthorized expenditures by the Company so that unauthorized payments may be recovered for the benefit of the Company and Plaintiff may recover his fair share of these *de facto* dividend distributions.

m)     Finally, Plaintiff seeks redress on behalf of the Company for fraud, conversion, conflict of interest transactions and the intentional breach of fiduciary duty by Defendants in connection with the operation and management of the Company.

2.

Plaintiff William R. Deal is a citizen and resident of Lincoln County, North Carolina, and owns 109.75 shares in the Company.

3.

Defendant Tugalo is a corporation organized and existing under the laws of the State of Georgia, with its principal place of business located in Toccoa, Stephens County, Georgia.

4.

Defendant Thomas Gilmer is a citizen of Georgia, who resides in Toccoa, Stephens County, Georgia. Mr. Gilmer is the CEO, director and majority

shareholder of the Company, and personally purports to own 208 shares of the Company.

5.

Defendant Sarah Gilmer Payne is the sister of Defendant Thomas Gilmer and a Director of the Company.  Ms. Payne is a citizen of Georgia who resides in Martin, Stephens County, Georgia, and owns 36 shares of the Company.

6.

Defendant Etheldra Gilmer is the wife of the late E. S. Gilmer, Jr., the mother of Defendants Thomas Gilmer and Sarah Gilmer Payne, and a former Director of the Company.  Etheldra Gilmer is a citizen of Georgia who resides in Toccoa, Stephens County, Georgia.  Etheldra Gilmer owns 6.5 shares of stock in the Company.

7.

Defendant Bruce Stancil, Jr. is a close friend of the Gilmer family, the former Vice President and Secretary of the Company, and a Director of the Company.  Mr. Stancil is a citizen of Georgia who resides in Evans, Georgia.  Mr. Stancil now owns only one (1) share of stock in the Company, after his prior ownership interest of twenty-nine (29) additional shares was improperly redeemed by the Company for a payment of $300,000.  In the course of causing the Company to redeem Mr. Stancil's shares, Defendants preferred Mr. Stancil over other

shareholders and failed to comply with the Bylaws that provide a right of first refusal in the remaining shareholders to purchase such stock.

8.

Defendant Ray Crenshaw is the current Vice President and Secretary of the Company and a Director of the Company. Mr. Crenshaw is a citizen of Georgia who resides in Toccoa, Stephens County, Georgia.

9.

Defendant Lewis Smith is a long time employee, officer (Vice President), and former Director of the Company. Mr. Smith is a citizen of Georgia who resides in Stephens County, Georgia.

10.

Plaintiff is a citizen of North Carolina. Defendants are citizens of Georgia. Accordingly, there is diversity of citizenship between the parties within the meaning of 28 U.S.C. § 1332. Moreover, the amount in controversy, without interest and costs, exceeds the sum or value ($75,000) required by 28 U.S.C. § 1332. Accordingly, this Court may exercise subject matter jurisdiction over this action.

11.

Venue is also appropriate in this District and Division pursuant to 28 U.S.C. § 1391 and Local Rule 3.1 (N.D. Ga).

12.

The majority of the outstanding shares in Tugalo are owned and/or controlled by Defendant Thomas Gilmer.  With respect to the claims Plaintiff asserts derivatively on behalf of the Company, given the nature of these asserted claims and the antagonistic managerial control of the Company by Defendant Thomas Gilmer and other Defendants, Plaintiff's claims are unavoidably opposed by the Company.  As such, Tugalo is properly aligned as a Defendant in this proceeding.  See Duffey v. Wheeler, 820 F.2d 1161 (11th Cir. 1987).

13.

Defendants' actions, described herein, were taken in concert, and Defendants' actions have caused special and distinct injuries to Plaintiff, thereby authorizing a direct action in this case.  See Rosenfeld v. Rosenfeld, 286 Ga. App. 61 (2009).

14.

Tugalo is a closely held corporation.

15.

As discussed more thoroughly below, the reasons for the general rule requiring a derivative suit do not apply to Plaintiff's direct claims.  Id.; Kirk v. First Nat. Bank of Columbus, 439 F. Supp. 1141 (M.D. Ga. 1977); Stoker v. Bellemeade, LLC, 272 Ga. App. 817, 821 (3) (615 SE2d 1) (2005).

16.

To wit: (a) Defendant Tugalo is a closely held corporation; (b) there is no risk of multiple suits by shareholders in this case; (c) there is no need for protection of corporate creditors in this case (financial statements show no significant debts); (d) in the event of a recovery, merely increasing all share values of Defendant Tugalo would not adequately compensate Plaintiff; and (e) it would be futile to require Plaintiff, a minority shareholder, to sue on behalf of Defendant Tugalo when the recovery from such a suit would merely return funds to the control of the individual Defendant shareholders/directors and there is no ready market for the minority shares of Defendant Tugalo in any case.  Id.

17.

As such, Plaintiff is authorized to bring this action against Defendants as a direct action.  Id.

18.

Defendant Tugalo was incorporated in the State of Georgia in 1946, by his maternal grandfather, Edward S. Gilmer, Sr., his grandfather's son (and Plaintiff's uncle), E. S. Gilmer, Jr. and Roy Whiten.  At that time, five hundred (500) shares of common stock of the Company were issued.  While Edward S. Gilmer, Sr. acquired the majority of the shares, a small number of shares were issued to three (3) employees, Roy Whiten, George Roberts and Bruce Stancil, Sr.

19.

The founder of the Company, Edward S. Gilmer, Sr. had two children, E. S. Gilmer, Jr. and Elizabeth Gilmer Deal.  E. S. Gilmer, Jr. was employed by the Company and ultimately became its CEO.  Elizabeth Gilmer Deal moved to North Carolina and while not actively involved in the day to day management of the Company, served for many years on the Board of Directors of the Company.  At the time of his death, Edward S. Gilmer, Sr. bequeathed two hundred nineteen and one-half (219.5) shares of Company stock to Elizabeth Gilmer Deal, constituting approximately forty-nine percent (49%) of the outstanding Company shares he owned.  The remaining shares were bequeathed to E. S. Gilmer, Jr., who was then the CEO of the Company.

20.

E. S. Gilmer, Jr. had a wife, Defendant Etheldra Gilmer; a son, Defendant Thomas Walker Gilmer; and a daughter, Defendant Sarah Gilmer Payne.  At the time of the death of E. S. Gilmer, Jr., Defendant Thomas Gilmer inherited the majority of E. S. Gilmer, Jr.'s shares in the Company, along with his sister and mother.

21.

Elizabeth Gilmer Deal married Maurice Deal and had two (2) sons, William "Bill" Deal (the "Plaintiff") and Robert "Bobby" Deal.  Both Robert Deal and his

mother Elizabeth Gilmer Deal served on the Board of Directors of the Company for many years. Robert Deal was employed by the Company, and ultimately served as Manager of its Clayton, Georgia operations. In 2005, the Company shares owned by Mrs. Deal and her sons were transferred into a North Carolina limited liability company, EGD Holdings. Subsequently, Mrs. Deal passed away. However, prior to her death, those shares were transferred into a revocable trust, with respect to which Plaintiff served as a Co-Trustee. The revocable trust subsequently assigned shares to its Co-Trustees in their individual capacities, and Plaintiff now owns his shares in the Company outright.

22.

In connection with the incorporation of the Company and the original issuance of shares to the initial shareholders, certain Bylaws were approved by the Company and its shareholders. These Bylaws provided for the existing shareholders to have a right of first refusal to purchase any shares proposed to be sold by or purchased from an existing shareholder. (See Art. VII, Section 5, paragraph(a) of Tugalo's Bylaws). This provision reads as follows:

> Any stockholder desiring to sell or transfer his stock in the Company shall first offer it to the other stockholders of the Company at the price of which said stock is to be sold. Should the remaining stockholders refuse or fail to purchase the stock, and should all the stockholders individually likewise so fail and refuse to purchase the stock, then the stockholders may sell to persons or corporations other than those who are stockholders of the Company.

23.

Notwithstanding the existence of the Company Bylaws, and based upon the information and belief of Plaintiff, Roy Whiten proceeded to sell the shares he owned to another shareholder, believed to be George Roberts, without offering it to the other stockholders of the Company.   In addition, although this transaction occurred many years ago, during the 1990's, Thomas Gilmer, the present CEO of the Company and the son of E. S. Gilmer, Jr., subsequently purchased an ownership interest amounting to approximately fifty (50) shares from George Roberts.   This transaction also failed to comply with the Company Bylaws that provide for a right of first refusal in all the other shareholders to purchase such shares.

24.

Moreover, on or about June 24, 2009, Thomas Gilmer caused the Company to purchase twenty-nine (29) out of thirty (30) shares of Company stock, formerly owned by Bruce Stancil, Sr., that at the time of the purchase were owned by Mr. Stancil's son, Bruce Stancil, Jr.  These twenty-nine (29) shares were purchased for a purchase price of three hundred thousand dollars ($300,000.00), or over ten thousand dollars ($10,000) per share.  This transaction was undertaken by the Company without notice to all of the shareholders, particularly the Plaintiff, who was not advised of this transaction, and only became aware of same several years

after it occurred.  This transaction also failed to comply with the Company Bylaws that provide for a right of first refusal in the other shareholders to purchase such shares.

25.

Accordingly, at present, there are only 471 shares of Tugalo outstanding and 29 treasury stock.  The current shareholders of Tugalo and the shares owned by each along with Treasury Stock are as follows:

| | |
|---|---|
| Thomas W. Gilmer | 208 |
| Sarah Gilmer Payne | 36 |
| Etheldra Gilmer | 6.5 |
| Bruce J. Stancil, Jr. | 1 |
| William Deal | 109.75 |
| Robert Deal | 109.75 |
| Treasury Stock | 29 |

26.

 Through a voting trust, Thomas Gilmer controls 42.5 shares of Company stock owned by Defendants Etheldra Gilmer and Sarah Gilmer Payne.  As such, Thomas Gilmer directly controls 250.5 shares, and is the majority shareholder of Tugalo.

27.

Prior to April 2011, the shareholders of the Company received a return on their investment over and beyond any monetary dividends ever declared by the Company. For many years, the Company expended resources and funds to benefit the members of the Gilmer (and Deal) families in numerous respects. Plaintiff's mother and brother (Robert Deal) received cards to make gasoline purchases, as well as other benefits, including free quantities of propane. Mrs. Deal received a "salary" of $50,000 a year, even though she did not actually perform services for the Company. The Plaintiff received a payment of $500/month, purportedly pursuant to his deceased father's "consulting agreement" with the Company. Mrs. Deal and Robert Deal each received payments for serving as directors of the Company.

28.

Another manner of distributions involved lease payments. For years, the Company paid rent to family members or family partnerships, including Georgia Asphalt Company, a Georgia general partnership whose partners were Etheldra Gilmer and Elizabeth Deal.

29.

a) At the same time, Plaintiff was not fully apprised of the many other distributions and benefits made available by the Company to members of the

Gilmer family, and/or shareholders who were their close friends.  The Company routinely paid for numerous personal expense items for the benefit of Gilmer family members and friends, including without limitation, automobiles used primarily by Thomas Gilmer and members of his family, repairs and/or improvements to the residences of members of the Gilmer family, fuel, repairs and maintenance on an airplane owned by Mr. Gilmer, and gas cards for family members.  These and other distributions were made by the Company to members of the Gilmer family and/or other shareholders, and intended to benefit them personally, for which there was no reasonable business purpose.

b)  During a hearing held on October 29, 2013, before this Court in a prior case, *EGD Holdings v. Thomas Gilmer*, USDC NDGA (Gainesville Division) Civil Action No. 2:13-95, Tugalo's counsel appears to indicate that such benefits were paid to or for various Company shareholders.  Although the Company's counsel represented to the Court that such issues would be addressed in due course, Plaintiff does not believe the Company ever took any action to discontinue and address such conduct.  A copy of that hearing transcript is attached hereto as Exhibit "C". (See Exhibit C, p. 27).

30.

By way of example, after the October 29, 2013 hearing, Company employees:  (i) performed labor and charged the Company for the expenses of

work performed at Sarah Gilmer Payne's horse farm; (ii) repaired fences at the horse farm; (iii) remodeled a basement for Thomas Gilmer; (iv) hung pictures, Christmas lights and installed sod at Thomas Gilmer's home; (v) installed sod and performed construction and maintenance work at Thomas Gilmer's airport hangar; (vi) moved Thomas Gilmer's boat to Lake Burton in and out of dry storage; (vii) cleaned and maintained Thomas Gilmer's lake house; and (viii) polished and maintained Thomas Gilmer's personal vehicles.

31.

For many years the Gilmer family and Deal family shared in the management and profits of the Company.  However, when Thomas Gilmer became President and Chairman of the Board of the Company upon his father's death in 1994, Etheldra Gilmer declared that Robert Deal had "better not get in Thomas' way."

32.

In 2009, when Bruce Stancil, Jr. retired as Vice President and Secretary of the Company, Robert Deal called his cousin Thomas Gilmer to express his interest in assuming Stancil's responsibilities and position at the Company.  Thomas Gilmer discouraged the idea.  Later, Thomas Gilmer called Robert Deal back to say that Stancil's responsibilities would be divided and no one would fill that position.

33.

Shortly thereafter, Robert Deal learned that he had been listed falsely as the CEO of the Company on an annual registration form filed with the Georgia Secretary of State, in connection with the Company's 2008 registration. At that time, certain third party claims were pending against the Company that apparently motivated this inaccurate designation. Concerned that he could be exposed to liability as though he were an officer, Robert Deal demanded that this information be changed.

34.

This discovery, and Mr. Gilmer's hesitancy to promote Robert Deal, caused members of the Deal family to question whether they were being treated fairly by the Company, as well as what the true intentions of the Gilmer family were. Since it appeared Deal family members would be excluded from higher management, the Deal family began to suspect they were not receiving their proportionate share of Company profits and associated benefits.

35.

By letter dated April 18, 2011, EGD Holdings, an entity established to hold the shares of the Deal family, formally requested information that the Company was required to provide to its shareholders. Those requested documents included, without limitation, documents identifying the fixed assets and an asset identified as

"Genworth Fin," documents supporting outstanding capital stock and treasury stock, as well as documents evidencing the operating expenses reflected on the financial statements. A true and correct copy of that request is attached hereto as Exhibit "D". This request was received by the Company on April 20, 2011.

36.

Immediately thereafter, in response to the request, Thomas Gilmer undertook actions calculated to diminish the return and benefits associated with Plaintiff's shares, as well as to mislead, intimidate, and oppress the Plaintiff and other members of the Deal family from exercising their rights.

37.

By letter dated April 20, 2011, a true and correct copy of which is attached as Exhibit "E," Thomas Gilmer represented that personal charges would no longer be paid by the Company. This representation was made in direct response to the request for information dated April 18, 2011, from EGD Holdings. Despite this declaration, the Plaintiff recently discovered that Thomas Gilmer has continued to charge significant and material personal expenses to the Company through the present time.

38.

Thomas Gilmer's continuous payment of personal charges using Company funds following his representation that the Company would no longer do so

indicates that Thomas Gilmer had no intention of ceasing the Company's payment of personal charges, and that Thomas Gilmer misrepresented his present intention regarding the Company's payment of personal charges. Thomas Gilmer made this misrepresentation to discourage EGD Holdings and the Deal family from continuing their efforts to investigate and oversee the Company's payment of personal charges.

39.

Despite representing that no one would replace Stancil, Thomas Gilmer proceeded to promote Mr. Ray Crenshaw to fill Stancil's position.

40.

On April 25, 2011, Sarah Gilmer Payne, the sister of Thomas Gilmer, informed Robert Deal that his health insurance would thereafter be deducted from his pay. A true and correct copy of this email is attached hereto as Exhibit "F".

41.

Previously, the entire cost of Robert Deal's health insurance had been paid by the Company, as it had been for members of the Gilmer family.

42.

On April 26, 2011, despite Thomas Gilmer's representation to Robert Deal that he intended to avoid payment of personal charges by the Company, a Company employee was summoned to Mr. Gilmer's home to assist with

renovations in progress.  The employee was directed to purchase materials for installation in the home on Company credit.  As set forth with further specificity below, Mr. Gilmer continues to cause the Company to pay personal charges for the benefit of Mr. Gilmer and his family.

43.

The next day, on April 27, 2011, the Company issued notice of a shareholders' meeting and a board of directors meeting to be held immediately thereafter, scheduled for May 17, 2011.  Plaintiff had never received such a formal notice previously.  Insofar as Plaintiff only received a portion of the corporate documents and information originally requested, Plaintiff, along with other members of the Deal family, requested that the shareholders' meeting be postponed.  The meeting was rescheduled to June 16, 2011.

44.

Prior to the meeting scheduled in June, the Company changed the locks on the bulk plant and office in Toccoa.  Although as a corporate manager Robert Deal always had a key to access this plant and office, he was not given the new keys.

45.

The June board of directors meeting never occurred.  Months passed, and by letter dated January 2, 2012, Plaintiff and other members of the Deal family ultimately received a notice of the annual meeting of the shareholders and directors

20

of the Company.  A true and correct copy of this notice is attached hereto as Exhibit "G".

46.

On January 9, 2012, Plaintiff and other members of the Deal family protested that the notice was not provided sufficiently in advance and that the Company had yet to produce the documents previously requested (in April of 2011), including the general ledger and documents provided by the Company to the accountant that were purportedly relied upon in generating the Company's financial statements.  A true and correct copy of their protest is attached hereto as Exhibit "H."

47.

Although the meeting was continued to January 24, 2012, the Company failed to provide these documents prior to or at the meeting.

48.

On January 24, 2012, the annual shareholders meeting of the Company was held.  Thomas Gilmer voted his own shares and those held by the Voting Trust to deny the Deals' request for additional documents.  Thomas Gilmer also voted the majority of shares to remove Elizabeth and Robert Deal from the Company's Board of Directors.

49.

That same day, Thomas Gilmer issued a letter to Robert Deal.  A true and correct copy of Thomas Gilmer's January 24, 2012 letter to Robert Deal is attached hereto as Exhibit "I."  Up to this time, Robert Deal had never had a performance review.  Therein, Mr. Gilmer falsely alleged that Robert Deal had disregarded instructions regarding an account, falsely alleged that Robert Deal had assured a former employee that he would remain employed by the Company regardless of a guilty plea or conviction for child molestation charges, and falsely alleged that Robert Deal had failed to keep the Clayton office properly staffed.  The letter suggests that the Company no longer had the luxury of carrying "unproductive" or "inept" employees.  Robert Deal responded to Mr. Gilmer's unfounded allegations, suggesting that he was being unfairly retaliated against for seeking to protect his family's minority shareholder rights and the well-being of the Company.

50.

Nonetheless, the pattern of retaliation, oppression and discrimination against Plaintiff and other members of the Deal family continued.  The Company repeatedly delayed sending Robert Deal his paycheck.  The Company also stopped purchasing trucks from Plaintiff's tank-truck dealership and discontinued Elizabeth Deal's gas charge card.

51.

Thomas Gilmer also caused the Company to unilaterally reduce the amount of rental payments made by the Company to the family real estate partnership, Georgia Asphalt Company.  In contrast, Mr. Gilmer caused the Company to increase rental payments being made to him, based upon his lease to the Company of certain real property titled in his name.

52.

By letter dated October 12, 2012, Plaintiff and other members of the Deal family made a demand on the Board of Directors to investigate the personal charges and other actions by Defendants.  (See Exhibit B.)

53.

On December 15, 2012, Sarah Gilmer Payne issued a letter to Elizabeth Deal.  A true and correct copy of Sarah Gilmer Payne's December 15, 2012 letter to Elizabeth Deal is attached hereto as Exhibit "J".  Therein, she stated "due to increased scrutiny and threat of litigation by EGD Holdings, we can no longer disburse payments from the payroll account to non-employees, and you will receive no more checks from us in the future."

54.

Two days later, on December 17, 2012, Thomas Gilmer fired Robert Deal.

55.

Thus, as soon as Plaintiff and other members of the Deal family sought to obtain and review information from the Company to which they were legally entitled, Defendants caused the Company to cease providing substantial direct or indirect benefits to the Deals, and have continued to do so to the present day.

56.

Specifically, Defendants caused the Company to cease paying any salary whatsoever to Mrs. Deal.  Mrs. Deal and Robert Deal were removed from the Board of Directors.  Mr. Gilmer then conducted a campaign of false allegations and reprimands against Robert Deal that ultimately resulted in Robert Deal's termination by the Company.

57.

Defendants engaged in such efforts despite their false designation of Robert Deal as President of the Company at a time when the Company was involved in substantive litigation that created a concern about potential personal liability of the officers and directors, including certain Defendants.

58.

Since 2011, Thomas Gilmer has continued to cause the Company to reduce the amount of rent paid for certain real property owned in part by the Deals, and

leased to the Company, that was administered through a general partnership known as Georgia Asphalt.

59.

Through this and other similar conduct, Defendants have engaged in and caused a "freeze out" of all members of the Deal family,[1] including Plaintiff, from the operations of the Company.

60.

Defendants have sought to deny Plaintiff all benefits to which he may be entitled as a significant shareholder of the Company.  In fact, despite the existence of nearly $5 million in retained earnings as of December 31, 2016, Defendants have distributed only $7,500 as "officially designated" annual dividends to all shareholders.

61.

As a result of the confidential relationship between Defendants as officers and directors of the Company, and Thomas Gilmer's confidential relationship with Plaintiff, Defendants had an affirmative duty to disclose to Plaintiff all material information regarding the Company and Plaintiff's interest in the Company.

---

[1] As of this date, Elizabeth Deal is deceased, and Plaintiff's brother, Robert Deal, has expressed no interest in participating as a party in Plaintiff's lawsuit, but he has previously been apprised of his option to participate herein.

Defendants breached this duty by intentionally concealing or obfuscating the repeated misuse of Company funds.

62.

Since 2011, Defendants have continuously paid distributions and/or personal expenses using Company funds for the direct or indirect benefit of the Gilmer family, and other "favored shareholders" and directors who are close friends of the Gilmers.

63.

These distributions and expenditures include, without limitation, the following:

(a) In 2009, the Defendants arranged for the Company to improperly redeem twenty-nine (29) shares of the Company owned by close family friend, Defendant Bruce Stancil, Jr., for over $300,000 through an arrangement whereby Mr. Stancil would retain one (1) share in the Company. This redemption was transacted without notice to the Plaintiff, and violates the right of first refusal benefitting the shareholders provided for in the Bylaws of the Company. As such, this transaction constitutes an improper distribution to Mr. Stancil in violation of the Company Bylaws. Subsequently, on January 24, 2012, at the annual shareholders meeting of Tugalo, over the objection of Robert Deal, Defendants voted their shares to ratify this improper transaction. On that same date, the

Directors of Tugalo voted "to ratify all acts of the Board of Directors from September 25, 2009, through December 31, 2011" and, in addition, separately and specifically ratified this illegal transaction;

(b)     The Company pays for and maintains numerous vehicles for the personal use of Gilmer family members, including, but not limited to, Defendants Thomas Gilmer, Sarah Gilmer Payne, and Etheldra Gilmer.  On more than one occasion, after depreciating the vehicles on an accelerated basis, vehicle(s) have been gifted to one or more officers and directors of the Company, including certain Defendants.   Other distributions and/or expenditures (set forth with further specificity below) are made for the benefit of the Gilmer families that are then deducted as expenses by the Company, even though they are not made for any legitimate business purpose.  Such expenditures include payments for fuel, service, and maintenance on an airplane owned by Mr. Gilmer that are simply not reasonable or necessary for the operation of the Company and/or which payments represents wasteful, unnecessary spending on behalf of the Company for flight services that could be obtained at much lower rates commercially;

(c)     Mr. Gilmer has engaged in other conflict of interest transactions, whereby he has leased certain real property (in which he directly or indirectly owns an interest) to the Company, without attempting to ascertain or

document whether amounts paid as rent by the Company are reasonable and/or consistent with fair market value;

(d)     Mr. Gilmer, without the consent of the Plaintiff, has engaged in high volume stock trading, using substantial cash resources of the Company, thereby exposing such resources to a risk of loss during certain period(s) of the Company's fiscal year;

(e)     On June 25, 2014, at the annual Board of Directors' meeting, Defendants voted to cause the Company to indemnify them against any legal fees and costs incurred by any or all of them for the wrongs they have committed at the Company, and specifically amended the Company Bylaws to so state.  (See Exhibit "K," a compilation of Board of Director Meeting Minutes and Shareholder Meeting Minutes).  During June and October of 2014, Thomas Gilmer caused the Company to write him checks totaling more than One Hundred Eighty Thousand Dollars ($180,000.00), presumably as a result of this purported amendment to the Company Bylaws; and

(f)     Also on January 13, 2015, at the annual Board of Directors' meeting, Defendants voted to retroactively approve a previously undisclosed "compensation plan" for Mr. Gilmer and possibly other employees.  (See Exhibit K).  This "compensation plan" is excessive and ignores Mr. Gilmer's fraud and the payment of disguised distributions and dividends to himself as part of his

28

"compensation plan", thereby woefully understating the amount of "compensation" Mr. Gilmer has extracted from the Company.

64.

Defendants have failed and refused to provide Plaintiff with complete access to the books and records of the Company, thereby breaching their affirmative duty to disclose to Plaintiff all material information relevant to the Company or Plaintiff's interest in the Company.  Moreover, notwithstanding the concerns previously articulated by Plaintiff and other members of the Deal family, Defendants have failed to cause the Company to provide annual financial statements to the Deal shareholders that properly report and account for the operations of the Company, in accordance with generally accepted accounting principles and Defendants' fiduciary duties to the shareholders, including Plaintiff.

65.

Defendants have also concealed, obfuscated, or refused to disclose all of the direct and indirect benefits conferred upon themselves, members of the Gilmer family, and other shareholders, which constitute disguised dividends.

66.

Defendants have engaged in such extensive concealment, obfuscation, and failure to disclosure of such benefits that an independent forensic auditor should be

appointed, and paid for by the Company, to discover the full nature and extent of the distributions made in the last ten years to its shareholders.

67.

Prior to filing this Complaint, on March 27, 2017, Plaintiff served the Board of Directors of Tugalo with a comprehensive request for inspection and copying of Company records pursuant to O.C.G.A. § 14-2-1602.  This request was the second one issued on behalf of the Plaintiff, after the first request (dated July 9, 2015) had resulted in only a very limited production of corporate documents and tax returns made through Tugalo's corporate counsel.

68.

Although Tugalo did not produce all of the records requested by Plaintiff in his March 27, 2017 request, on or about August 11, 2017, the Company produced records that included, among others, the following:  (1)  United Community Bank account statements and records of checks issued by the Company for mid-2013 through mid-2017; (2)  Credit card statements for mid-2013 through mid-2017 from United Community Bank, Lowes, Home Depot, and Chevron/Texaco; (3) Board of Directors Meeting Minutes from 2007 through 2017 (see Exhibit K); and (4) the "Hay Group Report" referenced in the 2015 Meeting Minutes of The Board of Directors (not previously produced).  Prior to doing so, the Company also provided certain general ledger information for the years 2013, 2014, and 2015.

69.

These records reveal significant financial malfeasance by the Defendants, who have authorized and/or permitted the expenditure of hundreds of thousands of dollars of Company funds for the direct and/or indirect personal benefit of Tugalo officers and directors, including (without limitation) Defendants Thomas Gilmer and Sarah Gilmer Payne (in addition to and outside of payroll payments).

70.

Moreover, these records expose a pattern and practice of conflicting interest transactions and Company expenditures for the personal benefit of Company insiders.  Specifically, the practice, which has continued uninterrupted since 2011, is to falsely represent personal benefits and payments as legitimate Company expenditures on the Company ledgers, financial statements and tax returns, when such payments, in truth, represent *de facto* dividends, which Defendants have accepted in lieu of properly-authorized dividends or an increase in the value of their shares, or unauthorized transfers for the benefit of Company officers and/or directors.

71.

Defendants have fraudulently concealed and misrepresented such *de facto* dividends and improper expenditures (that are not properly deductible by the Company) as "Company expenses."

72.

Defendants' engaged in such fraudulent concealment and misrepresentation to induce Plaintiff into relying on their misrepresentations and to discourage Plaintiff from attempting to exercise his right to obtain financial information about the Company.   Throughout the time that Defendants engaged in such fraudulent concealment and misrepresentation, Defendants represented to the Deal family that expenditures for the personal benefit of shareholders and directors would no longer be authorized (see, e.g., Exhibit E), and the Board specifically decreed in The Directors' Meeting Minutes of April 8, 2014, that Company earnings would be retained in the Company "to the highest extent possible" (see Exhibit K).

73.

Given Plaintiff's difficulty and inability to discover significant improper Company expenditures, it is apparent that Defendants have also intentionally misrepresented the nature and extent of the Company's "investigation" in response to Plaintiff's statutory request for the Company to investigate the conduct engaged in by Defendant Thomas Gilmer and his family.

74.

Despite Defendants' efforts to stonewall and conceal their improper use of Company funds, Plaintiff has been able to discover many improper transactions and expenditures paid for the benefit of these Defendants and others.   Clearly,

therefore, the so-called "disinterested persons" the Board purportedly designated to investigate should have been able to discover these and many other such transactions and expenditures.  Their failure to do so demonstrates the existence of a conspiracy to conceal the ongoing fraudulent conduct of Defendants.

75.

The records produced by Tugalo show numerous suspect expenditures, that include without limitation the following expenditures reflected in the statements for the Company's United Community Bank Checking Account (ending in 1810) (the "Tugalo General Account"):

- Checks written to "Cash" totaling $61,144.92 from June, 2013 through June, 2017;

- A March 25, 2014 check for $30,000 to Defendant Sarah Gilmer Payne;

- A total of $269,169.47 in checks to Defendant Thomas Gilmer from June 2014 through June 2017, including payments of $100,849.17 on June 2, 2014, and $80,000 on October 14, 2014.   (The "For" lines on these checks are blank).

- Checks written to "Curahee Auto Detailing", an auto detailing shop in Toccoa, Georgia, totaling $8,500;

- Checks paid in connection with the use and enjoyment by Thomas Gilmer of his personally-owned airplane, including payments to Jeppeson

Sanderson, Inc., a designer/developer of computerized flight planning software, for $4,824.48, Toccoa Stephens County Airport Authority for $4,640.00, and Triad Engines, Parts and Service (a/k/a Triad Aviation) for $48,562.00;

- Checks to "Tour de Tugaloo", an annual bicycle race in Toccoa, Georgia, totaling $71,830.94, where the Company is not even listed as a sponsor on the Tour's website (http://www.tourdetugalo.com/sponsors);

- Checks for Home Improvement/Farm/Horse Supplies and Landscaping exceeding $100,000;

- Checks to Federated Insurance totaling $330,042.27; Holman & Company (an insurance agency) for $423,600.00, United States Fire Ins. Co. for $35,435.00, Zenith Insurance Co. for $22,182.06, and Greater Georgia Life Insurance Co. for $20,792.63.  (While Plaintiff understands Tugalo incurs certain legitimate insurance expenses, the amounts paid to this variety of insurers, including life insurers, remains suspect.)

76.

Other suspect expenditures by the Company are reflected in the United Community Bank Credit Card ("UCB Credit Card") and appear related to:

- The operation of Defendant Thomas Gilmer's private  airplane (Jeppesen Sanderson (designer/developer of computerized flight planning

software), Raleigh Jetport, BHM Atlantic (Atlantic Aviation in Birmingham, Alabama), TAP Publishing (publishes "Trade-A-Plane" magazine), Foreflight, LLC (flight planning apps), Sporty's Cat (pilot shop), Epps Aviation; and SiriusXM;

- Personal entertainment / electronics / cell phone (Apple Store; iTunes; BestBuy; AT&T);

- Expenses incurred for interior design and home furnishings (JHK Store, Woodland Direct, PMT Shopnexgrill);

- Automotive expenses, including what appears to be payment for "DUI school" with "A-1 DUI Online"; Buick Club of America;

- Purchase of firearms and related optics (GunPro Armory, SQ A & B Optics);

- Expenses related to accounting software (TR Prof Software SVC);

- Medical charges (Carolina Ophthalmology);

- Hunting and/or fishing licenses (GA DNR- Go Outdoors); and

- Insurance (Progressive).

77.

Defendants routinely utilize Tugalo's UCB Credit Card to pay for personal items that have no reasonable relation to the business of the Company. For example, the $2,132.56 spent at GunPro Armory and the $54.00 spent at GA DNR-

Go Outdoors (hunting and/or fishing licenses from the State of Georgia) are not legitimately connected to the business of Tugalo.

78.

Thomas Gilmer routinely uses Tugalo's UCB Credit Card to pay expenses related to his airplane and vehicles.  Even if Thomas Gilmer's airplane were used for Company business of "if needed," this use would still not justify the other expenditures on aviation-related items such as the thousands of dollars spent with SiriusXM, Jeppesen Sanderson, Foreflight LLC, and Sporty's Cat.  Nor is there any legitimate connection between belonging to the "Buick Club of America" and the operation of Tugalo.

79.

Other suspect expenditures by the Company are reflected in the Home Depot and Lowes Credit Card Statements.

80.

The Home Depot Credit Card and Lowes Credit Card have been used to purchase construction materials and items not normally associated with running a propane gas supply company.  For example, there are charges for laundry baskets, shower baskets, drywall, lumber, wall caps, stud sensors, grill covers, fast drying cement, laundry detergent, dishwasher soap, vacuum bags, toilet paper, coffee machines, shovels, lawn mowers, weed eaters, air compressors, potting soil,

dishwashers, refrigerators, stoves, patio umbrellas (purchased by Lori Gilmer, Defendant Thomas Gilmer's wife), toilet brushes, thousands of dollars of painting supplies, downspout materials, coolers, Christmas decorations, drills, door sweeps, "snake repel," hedge trimmers, peat moss, "whisky barrels" for outdoor planting, water hoses and nozzles and adaptors for water hoses, tomato cages, soil, vacuum cleaners, shelving materials, river stones, storage bins, windows, carpenter work tables, pine straw, 2x6 boards, jack posts, nails, 4x8 panels, joist hangers, saws, screws, nails, washers, liquid nail, PVC pipe, drain plugs, wall mounted hose reels, roof paneling, travertine tile, flowers, sprinklers, and yard blowers.

81.

Still more suspect expenditures by the Company are reflected in the Chevron/Texaco Credit Card Statements.

82.

The Chevron/Texaco Credit Cards have been utilized to purchase food and premium or "super" fuel, along with airplane fuel. The total amount charged on the Tugalo Chevron card alone, for the period July 2013 through May 2017, for premium automotive fuel and/or food was $10,106.61. These charges have been made in a variety of locales, including but not limited to, Fernandina Beach, Florida; Statesboro, Georgia; and Birmingham, Auburn, and Oxford, Alabama.

None of these locales is anywhere near Tugalo's operating area (Northeast Georgia and nearby areas in South Carolina and North Carolina).

83.

Thus, it appears these charges were not made for Tugalo's delivery trucks which, no doubt, do not run on premium fuel, but, instead, more likely run on diesel or regular gasoline.  It is also doubtful that Tugalo is purchasing "snacks" for its drivers to eat as they deliver gas.  Instead, it appears these charges have been made by Defendant Thomas Gilmer for his various cars that use premium fuel – including, but not limited to, his Jaguar and/or his wife's Mercedes Benz.

84.

Further, in addition to purchasing premium fuel for his cars and "snacks" for the ride, Defendant Thomas Gilmer has evidently utilized the Tugalo Chevron card for dozens of purchases of aircraft fuel totaling $21,936.84 since late September 2013.

85.

The Board of Director Meeting Minutes expose the conflicting interest transactions that the Company has entered into with Thomas Gilmer by leasing storage tanks and the "bulk plant" from him, with no analysis or documentation whatsoever as to the commercial reasonableness of the rates paid by the Company

to Defendant Thomas Gilmer. (See Exhibit K, January 7, 2014 Minutes, January 13, 2015 Minutes, and January 20, 2016 Minutes.)

86.

These conflicting interest transactions, which directly benefited Defendant Thomas Gilmer at the expense of Plaintiff and the other shareholders of Tugalo, were taken while simultaneously cutting the rate paid by Tugalo to Georgia Asphalt, an entity partially owned by the Deal family, for the lease of certain offices.  (See Exhibit K, January 20, 2016 Minutes.)  Again, the minutes reflect no discussion by Defendants concerning the commercial reasonableness of the rate paid by Tugalo to Georgia Asphalt.  (Id.)

87.

Moreover, the "Hay Report," which the Directors claim to be a basis for approving Thomas Gilmer's compensation in the Board's January 2015 Meeting Minutes (see Exhibit K), is merely a charade that evaluates a grossly understated figure for Thomas Gilmer's compensation and does not account for the Company's payment of Thomas Gilmer's personal expenses and other various unexplained transfers of money to Thomas Gilmer from the Company.

88.

Additionally, the Board failed to follow the recommendations in the "Hay Report" respecting Thomas Gilmer's compensation, regardless of whether the Hay

Report considered Thomas Gilmer's actual or understated compensation. Nor did the Board authorize any specific level of compensation to Thomas Gilmer in these Meeting Minutes, much less any level of compensation including the other expenditures and distributions for the personal benefit of Thomas Gilmer and his family made by the Company. As such, any specific level of annual compensation to Thomas Gilmer has yet to be formally reviewed or properly approved by the Company.

89.

The Board's attempt on June 25, 2014, to amend the Bylaws to allow for the indemnification of Company officers and directors against claims by aggrieved parties, such as the Plaintiff, failed to comply with the statutory requirements of O.C.G.A. § 14-2-851.

90.

Thus, any Company payments to any director, including Thomas Gilmer or Sarah Gilmer Payne, as reimbursement for expenses incurred in the litigation initiated against them by EGD Holdings, were improper because the June 25, 2014 amendment to the Bylaws was defective; there was no determination on the merits of that case rendered by the Court; and the Company did not receive any written affirmation of the director's good faith, or otherwise satisfy the conditions

precedent required for the Board to indemnify a director under O.C.G.A. § 14-2-851.

91.

Moreover, the statements of Tugalo's counsel at the October 29, 2013 hearing (see ¶ 29(b), above) demonstrate that these Defendants did not act in good faith in connection with their conduct that warranted that prior litigation.

92.

As such, the Board of Directors could not legitimately authorize the Company to indemnify directors of Tugalo, nor for that matter, can they authorize any advance for the purpose of paying attorneys' fees or expenses of litigation for the benefit of any officer or director by the Company.

93.

Plaintiff has incurred damages directly and proximately flowing from the disguised distributions and dividends made at the direction of Defendants, which the shareholder Defendants approved and/or ratified in lieu of the payment of properly-authorized dividends.   Plaintiff is entitled to recover as compensatory damages his share of distributions and dividends paid by the Company.

94.

The disguised dividends and other distributions, and improper accounting for such dividends and distributions as expenditures, grossly understates the

profitability of the Company and causes the value of Plaintiff's shares to be impaired, understated, and devalued. Such actions also negatively impact the marketability of Plaintiff's shares.

95.

Plaintiff is entitled to recover monetary damages directly and proximately caused by Defendants' respective participation in breaches of fiduciary duties to Plaintiff, and Defendants' self-dealing, waste, and participation in improper conflict of interest transactions.

96.

a)    On November 30, 2012, in accordance with negotiations then on-going between EGD Holdings and Tugalo and its representatives, Tugalo provided to the Deal family "A Business Valuation of Tugalo Gas Company, Inc." (the "Valuation") undertaken by Propane Resources, LLC ("Propane Resources").

b)    According to its website, Propane Resources has completed more than 300 valuations for propane companies.

c)    The Valuation values Tugalo on two separate bases: (1) "Earnings Value Multiple of EBITDA"; and (2) "Orderly Liquidation."

d)    According to the Valuation, the highest value of Tugalo to its shareholders is that achieved by an "Orderly Liquidation" of the Company.

e)     That 2012 valuation concluded that the valuation of the Company on an orderly liquidation basis substantially exceeds the valuation of Company shares as a going concern.  Nevertheless, Defendants continue to operate the Company in a manner that excludes the Plaintiff from participation in the benefits associated with operation of the Company.

f)     Defendants continue to breach their fiduciary obligations to Plaintiff and are effectively wasting assets in which Plaintiff has a legitimate ownership interest.

g)     It is an inherent breach of fiduciary duty to continue to operate Tugalo, depreciate and/or waste its corporate assets, as well as assume the risks associated with this enterprise, without properly accounting to and/or compensating Plaintiff as a significant minority shareholder under such circumstances.

h)     By way of example, Plaintiff recently learned from widespread media reports of an incident occurring on February 3, 2017, where the home of a Tugalo customer exploded in White County, Georgia, killing a seventy-one (71) year old man, completely destroying the home, and damaging numerous surrounding houses.  Three days prior to the explosion, on January 31, 2017, Tugalo had reportedly filled the tank at the home with propane and found nothing wrong. Tugalo had allegedly been apprised that there was good cause to believe the home

had a gas leak – a fact which Tugalo disputed – even after allegedly being informed that one hundred and twenty-five (125) gallons of propane had been delivered by Tugalo to the home's tank four (4) weeks prior and that the tank was empty.   A wrongful death lawsuit has been filed against Tugalo based on this incident, the existence of which was not disclosed by Defendants, but rather discovered by Plaintiff independently.

i)   Irrespective of the exposure to tort liability by Tugalo in connection with the above incident, the actions of Defendants constitute continuing tortious conduct which continues to negatively impact the value and marketability of Plaintiff's shares.   A preliminary and permanent injunction should issue enjoining the Company and its officers and directors from authorizing or making any expenditure not reasonably related to the operations or reasonable business objectives of the Company, and/or for which the Company receives no consideration, or consideration substantially below fair market value.

## COUNT I
## BREACH OF FIDUCIARY DUTY AGAINST THOMAS GILMER

97.

Plaintiff repeats and realleges the allegations set forth herein as if all such allegations were restated verbatim.

98.

Defendant Thomas Gilmer, as a director of the Company, the CEO of the Company, and its majority shareholder, occupies a positon of trust and special confidence with respect to the Plaintiff. This relationship requires Mr. Gilmer to act in good faith with respect to the duties he performs as an officer, director, and majority shareholder of the Company.

99.

As a result of Thomas Gilmer's position, at all times relevant to Plaintiff's claims, Thomas Gilmer has been under an affirmative duty to disclose all material facts relevant to Plaintiff's interest in the Company.

100.

Thomas Gilmer has engaged in the specific actions alleged herein, and other actions too numerous to include in this pleading, which reflect a pattern of improper conduct, whereby he has directed Company expenditures and/or distributions for his own benefit and the benefit of certain family members and friends, while discriminating against and oppressing Plaintiff.

101.

This pattern of improper conduct and the Board of Director Meeting Minutes and Shareholder Meeting Minutes (Exhibit K) reflect Thomas Gilmer's bias against Plaintiff.  Specifically, but without limitation, Thomas Gilmer has directed

and implemented the following actions calculated and intended to oppress members of the Deal family, including Plaintiff:

a)  Terminated annual payments made to Elizabeth Deal;

b)  Reduced lease payments by the Company made to Georgia Asphalt Co.;

c)  Removed Deal family members from the Board of Directors of the Company;

d)  Refused to promote Robert Deal to the position of Vice President and Secretary of the Company;

e)  Repeatedly delayed sending Robert Deal his paycheck;

f)  Refused to pay the cost of Robert Deal's health insurance;

g)  Locked Robert Deal, a corporate manager, out of the plant and office in Toccoa, Georgia;

h)  Sponsored a campaign of false allegations and reprimands against Robert Deal;

i)  Secretly and falsely designated Robert Deal as President of the Company at a time when the Company was involved in substantive litigation;

j)  Terminated Robert Deal's employment with the Company;

k)      Refused the Plaintiff's legitimate request for financial information concerning the Company and its payments and/or distributions to other shareholders;

l)      Ceased purchasing trucks from Plaintiff's tank truck dealership;

m)      Refused to allow a Board investigation of payments made by the Company to Thomas Gilmer or for his personal benefit or that of his family, outside the ordinary course of business;

n)      "Froze out" all Deal family members from the operations of the Company and halted benefits to which they were entitled as significant shareholders;

o)      Directed Company distributions and/or expenditures that constitute disguised dividends for the benefit of himself, the Gilmer family, Gilmer shareholders, and other shareholders who are close friends of the Gilmers in amounts totaling at least several hundred thousand dollars, including, but not limited to, all those expenditure set forth hereinabove;

p)      Arranged for the Company to improperly redeem shares of the Company owned by Defendant Bruce Stancil, Jr. for over $300,000 through an arrangement whereby Mr. Stancil would retain one (1) share in the Company - without notice or disclosure to the Plaintiff

and in violation of the right of first refusal in the shareholders provided for in the Company Bylaws;

q)   Paid for, fueled and maintained numerous vehicles and an airplane for the personal use of Gilmer family members;

r)   Made numerous other distributions and/or expenditures for the direct benefit of the Gilmer family that were then deducted as expenses by the Company even though they were not made for any legitimate business purpose, including, but not limited to, all those expenditure set forth hereinabove;

s)   Engaged in other conflicting interest transactions, whereby he leased certain real property (in which he directly or indirectly owns an interest) to the Company, without properly establishing that amounts paid as rent by the Company were reasonable and/or otherwise not more than fair market value;

t)   On information and belief, engaged in high volume stock trading, using substantial cash resources of the Company, thereby exposing such resources to a risk of loss during certain period(s) of the Company's fiscal year;

u)   Failed and refused to describe and specify all of the direct and indirect benefits conferred upon members of the Gilmer family and other

favored   shareholders,   that   constituted   disguised   dividends   and

improper distributions; and

v)     Understated   the   profitability   of   the   Company,   thereby   causing   the

value of the Plaintiff's shares to be impaired, understated or devalued,

thereby negatively impacting the marketability of such shares.

102.

Thomas   Gilmer   undertook   some   or   all   of   the   foregoing   actions   to   benefit

himself   and   other   members   of   the   Gilmer   family,   in   an   effort   to   pay   *de facto*

dividends to some shareholders without paying Plaintiff his share of dividends, to

which he is entitled.

103.

To the extent he has directed and implemented such actions as a director and

officer of the Company, Thomas Gilmer has failed to use reasonable and ordinary

care   and   has   abused   the   trust   and   confidence   originally   placed   in   him   by   the

Company and Plaintiff, for his own personal benefit.

104.

As such, Thomas Gilmer has breached his fiduciary duty to the Company

and Plaintiff.

105.

As a direct and proximate result of Thomas Gilmer's breach of fiduciary duty to the Company and Plaintiff, the Company and Plaintiff have incurred damages.

106.

Plaintiff has been injured as a result of Thomas Gilmer's conduct in a way that is particular to him and distinct from any injury to the Company because Thomas Gilmer failed to pay Plaintiff dividend distributions in proportion to Plaintiff's ownership interest when Thomas Gilmer caused the Company to make *de facto* dividend distributions to himself and other favored shareholders, including members of the Gilmer family. Defendants' actions also understate the profitability of the Company, cause the value of Plaintiff's shares to be impaired, understated and devalued, and impact the marketability of such shares.

107.

Therefore, Plaintiff is entitled to bring a direct action against Thomas Gilmer related to his breach of fiduciary duty.

108.

Plaintiff is also entitled to maintain this action derivatively, on behalf of the Company, to recover misappropriated assets and damages to the Company.

## COUNT II
## BREACH OF FIDUCIARY DUTY AND AIDING AND ABETTING BREACH OF FIDUCIARY DUTY AGAINST SARAH GILMER PAYNE, ETHELDRA GILMER, BRUCE STANCIL, JR., RAY CRENSHAW, AND LEWIS SMITH

### 109.

Plaintiff repeats and realleges the allegations set forth herein as if all such allegations were restated verbatim.

### 110.

Defendants Sarah Gilmer Payne, Etheldra Gilmer, Bruce Stancil, Jr., Ray Crenshaw, and Lewis Smith are required to use ordinary and reasonable care with respect to the duties they perform. Nonetheless, these Defendants have acted in concert with Thomas Gilmer, enabling and aiding and abetting Thomas Gilmer in his continuing breach of fiduciary duty to the Company and Plaintiff.

### 111.

In doing so, these Defendants have failed to use reasonable and ordinary care and have abused the trust and confidence originally placed in them by the Company and Plaintiff.  As such, these Defendants have breached their respective fiduciary duties to the Company and Plaintiff.

112.

As a result of their relationship to Plaintiff and the Company, these Defendants have an affirmative duty to disclose all material information pertaining to the Company and/or Plaintiff's ownership interest in the Company.

113.

As a direct and proximate result of the breach of fiduciary duties by these Defendants, the Company and Plaintiff have incurred damages.

114.

As a direct and proximate result of these Defendants aiding and abetting Thomas Gilmer's breach of fiduciary duty, the Company and Plaintiff have incurred damages.

115.

Plaintiff has been injured as a result of the conduct of these Defendants in a way that is particular to him and distinct from any injury to the Company because, as a result of the conduct of these Defendants, Plaintiff was wrongfully denied payment of dividend distributions in proportion to Plaintiff's ownership interest when other Shareholders, including the Gilmer family, received *de facto* dividend distributions from the Company. Defendants' actions also understate the profitability of the Company, cause the value of Plaintiff's shares to be impaired, understated, and devalued, and impact the marketability of such shares.

116.

Therefore, Plaintiff is entitled to bring a direct action against these Defendants related to their breach of fiduciary duty and aiding and abetting of Thomas Gilmer's breach of fiduciary duty.

117.

Plaintiff is also entitled to maintain this action derivatively, on behalf of the Company, to recover misappropriated assets and damages to the Company.

## COUNT III
## FRAUD

118.

Plaintiff repeats and realleges the allegations set forth herein as if all such allegations were restated verbatim.

119.

As current and/or former Directors of the Company, Defendants have had a confidential relationship vis-à-vis Plaintiff, and they have perpetrated a fraud upon Plaintiff, affirmatively misrepresenting and concealing material distributions to or for the benefit of Defendants that have no legitimate business purpose, and constitute disguised dividends.

120.

As a result of this confidential relationship, Defendants were under an affirmative duty to disclose all material facts relevant to the Company and/or

Plaintiff's ownership interest in the Company.  Defendants' failure to disclose the rampant misuse of Company funds constitutes a breach of Defendants' fiduciary duties.

121.

As evidenced by the fact that many of the expenditures and distributions described in paragraphs 62-63, 71, and 75-84 are misrepresented in the Company's ledgers, financial statements, and tax returns as purported legitimate business expenses, Defendants have affirmatively misrepresented material facts concerning the operations, expenditures, and/or distributions of the Company, or the purposes for such expenditures/distributions.

122.

In doing so, Defendants have also misrepresented the actual compensation being paid to the Company's offers and directors, including Thomas Gilmer and Sarah Gilmer Payne.

123.

Defendants also misrepresented their present intent, and that of the Company, to refrain from causing the Company to incur expenses for their personal benefit (see ¶¶ 37-38, above) as well as their intent, and that of the Company, to maximize retained earnings (see ¶¶ 70-72, above).

124.

Additionally, Defendants have misrepresented the nature and extent, if any, of any so-called "independent investigation" into Plaintiff's concerns and complaints, as well as certain decisions by the Board to engage in transactions involving conflicts of interest, in violation of the Defendants' fiduciary duties to the Company and to Plaintiff.

125.

Defendants have perpetrated a fraud upon Plaintiff by failing to disclose material facts concerning the Company's distributions or expenditures over a period of many years for the benefit of Defendants, that should and would have been disclosed to Plaintiff if Defendants had properly described the distributions and transactions by the Company.   Defendants' misrepresentations have also caused the overall financial condition of the Company, including its profitability, to be misrepresented for numerous years.

126.

Defendants knew at all times that the misrepresentations set forth above were false, and/or made recklessly without knowledge of their truth.

127.

Defendants did so with the intent and expectation Plaintiff would detrimentally and reasonably rely on such misrepresentations.

128.

Plaintiff did rely on Defendants' misrepresentations about the Company's financial information. Specifically, Plaintiff relied upon Defendants' representations, including the implicit representation that Defendants had disclosed all material facts in accordance with Defendants' fiduciary duties, in administering and otherwise managing his personal financial affairs and obtaining advice from his financial and legal advisors in connection therewith.  Plaintiff would have initiated this action earlier had he been fully apprised of the Defendants' tortious conduct, which would have curtailed to some extent Defendants' improper use of Company funds.

129.

Plaintiff has incurred damages as a direct and proximate result thereof, including damages equal to the distributions Plaintiff would have received if Defendants had accurately and properly characterized and accounted for payments that amount to *de facto* dividend distributions to or for the benefit of Defendants.

**COUNT IV**
**CONSPIRACY**

130.

Plaintiff repeats and alleges the allegations set forth herein as if all such allegations were restated verbatim.

131.

Defendants, in combination with one another, and by their concerted action, conspired to defraud, oppress, freeze out, and retaliate against Plaintiff, a minority shareholder, in breach of their fiduciary duties by authorizing and/or facilitating unauthorized Company expenditures and distributions and/or engaging in or facilitating conflicting interest transactions.  Defendants further conspired to conceal such unauthorized expenditures and distributions, and/or transactions, from the Plaintiff.  Defendants also cooperated with one another in allowing these expenditures and distributions to be misrepresented in the Company ledgers, financial statements and tax returns.

132.

Defendants did so in order to enrich themselves and one another while simultaneously impairing the value of Tugalo shares held by Plaintiff and causing other damages to Plaintiff.

133.

Plaintiff has been injured as a result of the Defendants' conduct in a way that is particular to him and distinct from any injury to the Company because, as a result of the conduct of these Defendants, Plaintiff was wrongfully denied payment of distributions in proportion to Plaintiff's ownership interest when the Gilmer family received *de facto* dividend distributions from the Company.  Defendants'

actions also understate the profitability of the Company, cause the value of Plaintiff's shares to be impaired, understated and devalued, and impact the marketability of such shares.

134.

Therefore, Plaintiff is entitled to bring a direct action against these Defendants related to their conspiracy.

135.

Plaintiff is also entitled to maintain this action derivatively, on behalf of the Company, to recover misappropriated assets and damages for injuries directly to the Company.

**COUNT V**<br>**JUDICIAL DISSOLUTION**

136.

Plaintiff repeats and alleges the allegations set forth herein as if all such allegations were restated verbatim.

137.

Defendants have acted and continue to act in a manner that is illegal and/or fraudulent in connection with the operation or management of the business and affairs of Tugalo.

138.

The Plaintiff holds at least 20 percent or more of all outstanding shares of Tugalo.

139.

The corporate assets of Tugalo are being misapplied and wasted by Defendants.

140.

For each of these reasons, the Plaintiff is entitled to relief under the provisions of O.C.G.A. § 14-2-1430, including, without limitation, dissolution of the corporation.

141.

Pursuant to O.C.G.A. § 14-2-1432, the Court should appoint a receiver to wind up and liquidate the business and affairs of the corporation and/or a custodian to manage, the business and affairs of the corporation pending dissolution of the Corporation.

## COUNT VI
## ABUSE OF CONTROL AGAINST THOMAS GILMER

142.

Plaintiff repeats and alleges the allegations set forth herein as if all such allegations were restated verbatim.

143.

Defendant Thomas Gilmer's conduct constitutes an abuse of his control and influence over Tugalo for which he is legally responsible.

144.

By reason of the foregoing, the Company has been damaged and has sustained, and will continue to sustain, irreparable injury.

145.

Plaintiff, as a shareholder of Tugalo, seeks damages for Tugalo.

## COUNT VII
## CLAIM FOR RECOVERY OF WRONGFUL DISTRIBUTIONS

146.

Plaintiff repeats and alleges the allegations set forth herein as if all such allegations were restated verbatim.

147.

Pursuant to O.C.G.A. § 14-2-832, a director who votes for or assents to a wrongful distribution is personally liable to the corporation for the amount of the distribution that exceeds what could have been properly distributed.

148.

Therefore, the Defendants are personally liable to the Company for the wrongful distributions for which they voted or to which they assented.

149.

Defendants either voted for or assented to certain distributions described herein.

150.

Pursuant to O.C.G.A. § 14-2-832, the Company is authorized to bring this action against Defendants to recover the above wrongful distributions, and Defendants are personally liable for repayment of the wrongful distributions for which they voted/assented.

## COUNT VIII
## CLAIM FOR ACCOUNTING

151.

Plaintiff repeats and alleges the allegations set forth herein as if all such allegations were restated verbatim.

152.

Pursuant to O.C.G.A. § 14-2-831, Plaintiff is authorized to bring an action on behalf of the Company to compel the directors of the Company to account for official conduct or to decree any other relief called for by the directors' conduct constituting, *inter alia*: (A) the violation of his or her duties in the management of the corporation or in the disposition of corporate assets; or (B) the acquisition, transfer to others, loss, or waste of corporate assets due to any violation of duties.

153.

The Defendants' conduct described herein constitutes a violation of the Defendants' duties in the management of the Company or in the disposition of the Company's assets.

154.

The Defendants' violation of their duties resulted in the wrongful acquisition, transfer to others, loss, or waste of the Company's assets.

155.

Defendants have caused certain payments to be made from the accounts of the Company to or for the benefit of certain Defendants and have discriminated against Plaintiff by failing and refusing to pay Plaintiff his fair share of Company distributions and by authorizing *de facto* dividend distributions to certain Defendants.

156.

The Court should compel the Defendants to account for their official conduct, which constitutes a violation of their duties.

157.

The Court should decree any other relief called for by the Defendants' official conduct, including repayment by the Defendants of all wrongful *de facto* dividend distributions.

## COUNT IX
## CLAIM TO ENJOIN UNLAWFUL CONVEYANCE OR TRANSFER OF CORPORATE ASSETS

### 158.

Plaintiff repeats and realleges the allegations set forth herein as if all such allegations were restated verbatim.

### 159.

Pursuant to O.C.G.A. § 14-2-831, Plaintiff is authorized to bring an action on behalf of the Company to enjoin any unlawful conveyance, assignment, or transfer of corporate assets or other unlawful transactions.

### 160.

The unlawful transactions and payment of *de facto* dividend distributions will continue to occur unless such conduct is enjoined by the Court.

### 161.

Plaintiff requests that the Court enter an order enjoining Defendants from continuing to engage in the unlawful transactions described above and payment of *de facto* dividend distributions described herein.

### 162.

Plaintiff requests that this Court enter a preliminary and permanent injunction preventing Defendants from engaging in further continuing tortious actions including, but not limited to: (1) unlawfully distributing the assets of the

Company for the benefit of certain shareholders and to the detriment of the Company and the remaining shareholders; (2) indemnifying and reimbursing Defendants for their legal fees; and (3) engaging in transactions inconsistent with the best interests of all Company shareholders.

**COUNT X**
**CLAIM TO SET ASIDE UNLAWFUL CONVEYANCE OR TRANSFER OF CORPORATE ASSETS**

163.

Plaintiff repeats and realleges the allegations set forth herein as if all such allegations were restated verbatim.

164.

Pursuant to O.C.G.A. § 14-2-831, Plaintiff is authorized to bring an action on behalf of the Company to set aside any unlawful conveyance, assignment, or transfer of corporate assets where the transferee knew of its unlawfulness and is made a party to the action.

165.

Here, certain Defendants were the recipients of unlawful payments made by the Company, and those Defendants knew of the unlawfulness of the payments.

166.

Plaintiff requests that the Court enter an order setting aside the unlawful payments made by the Company to or for the benefit of the Defendants.

## COUNT XI
## CONVERSION AND/OR MONEY HAD AND RECEIVED

### 167.

Plaintiff repeats and realleges the allegations set forth herein as if all such allegations were restated verbatim.

### 168.

The Company has paid numerous expenditures to and for the benefit of Defendants, that are unrelated to the business of the Company, and constitute unauthorized dividend distributions in favor of certain Defendants and their family members and friends, under circumstances where Plaintiff is not being paid his respective share of such dividends and distributions.

### 169.

Defendants' receipt of these payments was unlawful, Plaintiff has demanded (and hereby again demands) return of these payments on behalf of himself and the Company, and Defendants have refused to return these payments.

### 170.

As such, Defendants have engaged in a wrongful conversion of assets owned by the Company or assets that should have been distributed to Plaintiff.  As a result of Defendants wrongful conversion, the Company and Plaintiff have been damaged.

171.

Alternatively, Defendants are not legally or equitably entitled to retain such distributions, and should be required to return such distributions as money had and received.

172.

Plaintiff has been injured as a result of the Defendants' conduct in a way that is particular to him and distinct from any injury to the Company because, as a result of the conduct of these Defendants, Plaintiff was wrongfully denied payment of distributions in proportion to Plaintiff's ownership interest when the Gilmer family received *de facto* dividend distributions from the Company. Defendants' actions also understate the profitability of the Company, cause the value of Plaintiff's shares to be impaired, understated and devalued, and impact the marketability of such shares.

173.

Therefore, Plaintiff is entitled to bring a direct action against these Defendants under a theory of conversion and money had and received.

174.

Plaintiff is also entitled to maintain this action derivatively, on behalf of the Company, to recover converted assets and damages to the Company.

## COUNT XII
## APPOINTMENT OF AUDITOR TO ACCOUNT FOR FUNDS PAID TO OR FOR BENEFIT OF DEFENDANTS BY COMPANY

175.

Plaintiff repeats and realleges the allegations set forth herein as if all such allegations were restated verbatim.

176.

Thomas Gilmer and the other Defendants have failed to provide Plaintiff with access to all of the relevant financial information concerning the operations and finances of the Company.  Defendants have also intentionally and purposefully failed to account for the many questionable expenditures they have caused the Company to make.

177.

Defendants have also misrepresented the profits from operations of the Company to the extent they have sought to deduct disguised dividends in the form of the subject expenditures that are falsely represented in the Company ledgers, financial statements and tax returns, and are commonly (and improperly) deducted as ordinary business expenses, when they are in fact dividend distributions.

178.

Accordingly, Plaintiff requests that a neutral forensic accountant be appointed as a special master or auditor by this Court, at Company expense, to

obtain and review all relevant records of the Company relating to its operations and distributions for the benefit of any Defendants, to ascertain how much has been distributed to each Defendant, and under what circumstances, as well as to report the auditor's findings to the Court.

**COUNT XIII**
**DECLARATORY JUDGMENT DECLARING STOCK TRANSFER FROM BRUCE STANCIL, JR. TO THE COMPANY AS INVALID AND VOID AB INITIO AND ALLOWING  PLAINTIFF TO ACQUIRE SHARES CONSISTENT WITH COMPANY BYLAWS**

179.

Plaintiff repeats and realleges the allegations set forth herein as if all such allegations were restated verbatim.

180.

Plaintiff shows that Defendant Thomas Gilmer caused the Company to redeem/purchase twenty-nine (29) shares owned by Defendant Bruce Stancil, Jr. on June 24, 2009, for which the Company paid Mr. Stancil $300,000 ($10,394.83 per share).   At that time, Thomas Gilmer authorized and undertook this action without seeking proper authorization to enter into that transaction on behalf of the Company.  The other Defendants, acting in concert with Gilmer, subsequently and improperly ratified this transaction on January 24, 2012.  This transaction violated Company Bylaws, requiring that other shareholders be afforded a right to purchase

their respective portion of any shares made available for sale by existing shareholders of the Company.

181.

Plaintiff shows that the copy of the Bylaws provided to his counsel by the Company did not include the signature page of the Bylaws.  If and to the extent the Company Bylaws were executed under seal, and/or Plaintiff is otherwise authorized by law to challenge this transaction, the action of the Company in purchasing Mr. Stancil's shares, taken at the direction of Thomas Gilmer without notice to Plaintiff (or Elizabeth Deal or Robert Deal, who were then members of the Board of Directors of the Company), gives rise to a case or controversy concerning the application and enforceability of the Bylaws to this 2009 transaction.

182.

Plaintiff seeks a declaratory judgment by this Court that the July 24, 2009 purchase of Mr. Stancil's stock by the Company violated Company Bylaws, is unenforceable, and void ab initio.

## **COUNT XIV**
## **UNJUST ENRICHMENT**

183.

Plaintiff repeats and realleges the allegations set forth herein as if all such allegations were restated verbatim.

184.

Defendants have been and continue to be unjustly enriched by their receipt and retention of funds as alleged herein, as well as to the extent they received the benefit of unauthorized expenditures made by the Company, and it would be unconscionable to allow Defendants to retain the benefits thereof.

185.

To remedy Defendants' unjust enrichment, the Court should order them to disgorge to the Company all of the funds they have wrongfully received in any and all amounts, as ultimately established by an accounting.

**COUNT XV**
**UNAUTHORIZED PAYMENT BY COMPANY TO DEFENDANT BRUCE STANCIL, JR. FOR HIS SHARES SHOULD BE REVERSED AS AN UNAUTHORIZED DISTRIBUTION, AND RETURNED TO THE COMPANY AS MONEY HAD AND RECEIVED**

186.

Plaintiff repeats and realleges the allegations set forth herein as if all such allegations were restated verbatim.

187.

To the extent the purchase by the Company of shares from Bruce Stancil, Jr. is and should be set aside as an unauthorized, unenforceable, void transaction, Defendant Bruce Stancil, Jr. should be required to return to the Company all funds

he received, as money had and received, that he is not equitably entitled to retain under the applicable circumstances.

## COUNT XVI
## PUNITIVE DAMAGES PURSUANT TO O.C.G.A. § 51-12-5.1

188.

Plaintiff repeats and realleges the allegations set forth herein as if all such allegations were restated verbatim.

189.

The actions of Defendants described above show willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to their consequences.

190.

Accordingly, Plaintiff requests an award of punitive damages against Defendants, jointly and severally, in accordance with O.C.G.A. § 51-12-5.1.

191.

Each Defendant acted with the specific intent to cause harm to Plaintiff. Accordingly, there should be no limitation regarding the amount which may be awarded as punitive damages against each Defendant and in favor of Plaintiff, pursuant to O.C.G.A. § 51-12-5.1(f).

## <u>COUNT XVII</u>
## <u>ATTORNEYS' FEES AND COSTS OF LITIGATION</u>

192.

Plaintiff repeats and realleges the allegations set forth herein as if all such allegations were restated verbatim.

193.

Defendants have acted in bad faith, have been stubbornly litigious, and/or have caused Plaintiff unnecessary delay and expense.

194.

Accordingly, pursuant to O.C.G.A. § 13-6-11, Plaintiff is entitled to recover his reasonable attorneys' fees and costs of litigation against Defendants, jointly and severally.

195.

Alternatively, Plaintiff shows he is entitled to recover his reasonable attorneys' fees and costs of litigation as an element of compensatory damages attributable to the tortious conduct of Defendants.

WHEREFORE, Plaintiff requests that this Court consider the claims of the Plaintiff herein, and grant Plaintiff the relief requested over and against the Defendants.   Specifically, Plaintiff requests judgment against all Defendants as follows:

a)     Declaring that this is a proper direct action maintainable under law by Plaintiff and against Defendants, or, in the alternative, declaring that Plaintiff may proceed with this action as a derivative claim;

b)     Declaring that the stock transfer from Bruce Stancil, Jr. to the Company is invalid and void ab initio and allowing Plaintiff to acquire such shares consistent with the Company bylaws;

c)     Declaring that the payment by the Company to Bruce Stancil, Jr. for his shares is an unauthorized transaction, reversing that transaction, and requiring that Bruce Stancil, Jr. must return such payment to the Company as money had and received;

d)     Declaring that Defendants have breached their fiduciary duties to Plaintiff and the Company;

e)     Declaring that the unauthorized distributions and transactions complained about herein represent conversion and/or money had and received;

f)     Appointing an auditor to identify those unauthorized distributions and transactions and account for them;

g)     Ordering that such unauthorized distributions and transactions be reversed and that such amounts be returned to the Company;

h)      Determining and awarding Plaintiff the damages sustained by him as a result of the violations as set forth above from each of the Defendants, jointly and severally, together with interest thereon;

i)      Determining and awarding Tugalo the damages sustained by it as a result of the violations as set forth above from each of the Defendants, jointly and severally, together with interest thereon;

j)      Directing Defendants to take all necessary actions to reform and improve the corporate governance of the Company;

k)      Awarding to Plaintiff the costs and fees of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

l)       Enjoining Defendants from taking further tortious actions, including without limitation,   making unauthorized and/or unlawful distributions of the Company's assets, and/or engaging in transactions inconsistent with the best interests of all Company shareholders;

m)      Awarding to Plaintiff punitive damages and that there be no cap on the damages awarded Plaintiff in accordance with O.C.G.A. § 51-12-5.1(f);

n)      Awarding Plaintiff his reasonably incurred attorneys' fees and costs of litigation, pursuant to O.C.G.A. § 13-6-11;

o)      Granting Plaintiff such other and further relief as this Court deems just and proper; and

p)      That Plaintiff be granted a jury trial as to all issues so triable.

Respectfully submitted, this 29th day of November, 2017.

> *s/ G. Marshall Kent, Jr.*
> G. Marshall Kent, Jr.
> Georgia Bar No. 415129
> Steven D. Henry
> Georgia Bar No. 348040
> Dorothy H. Cornwell
> Georgia Bar No. 552635
>
> Attorneys for Plaintiff

**SMITH MOORE LEATHERWOOD LLP**
1180 West Peachtree Street NW
Regions Plaza, Suite 2300
Atlanta, GA  30309-3482
Telephone:  404-962-1000
Facsimile:   404-962-1200

## CERTIFICATE OF SERVICE

Pursuant to Local Rule 7.1D, ND Ga., I hereby certify that the foregoing pleading was prepared in Times New Roman 14-point font, in accordance with Local Rule 5.1C.  I further certify that on this date I filed a copy of the foregoing document using the Court's ECF/CM system, which will automatically send notice of such filing to the following counsel of record:

Matthew A. Cathey, Esq.          D. Lee Clayton, Esq.
Dennis T. Cathey, Esq.           Evelyn A. French, Esq.
Cathey and Strain, LLC           Swift, Currie, McGhee & Hiers, LLP
P. O. Box 689                    Suite 300, The Peachtree
649 Irvin Street                 1355 Peachtree Street, N.E.
Cornelia, Georgia  30531         Atlanta, Georgia  30309-3231


James E. Cornwell, Esq.          Amy K. Weber, Esq.
CORNWELL LAW, LLC                John M. Gross, Esq.
P. O. Box 850                    Taylor English Duma LLP
Toccoa, Georgia  30577           1600 Parkwood Circle, Suite 200
                                 Atlanta, Georgia  30339


This 29th day of November, 2017.

                                 *s/ G. Marshall Kent, Jr.*
                                 G. Marshall Kent, Jr.
                                 Georgia Bar No. 415129
                                 Attorney for Defendant

ATLANTA 1563832